IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Marsha L. Driggs,                :

    Plaintiff,               :

  v.                             :           Case No. 2:11-cv-0229

Commissioner of Social Security,    JUDGE JAMES L. GRAHAM
                                             Magistrate Judge Kemp
    Defendant.              :

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Marsha L. Driggs, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability benefits and supplemental security income. Those applications were filed on January 18, 2007, and alleged that plaintiff became disabled on March 19, 2002, but that date was later amended to October 11, 2007.

After initial administrative denials of her claim, plaintiff was given a hearing before an Administrative Law Judge on November 25, 2009. In a decision dated January 28, 2010, the ALJ denied benefits. That became the Commissioner's final decision on January 14, 2011, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on May 26, 2011. Plaintiff filed her statement of specific errors on July 29, 2011. The Commissioner filed a response on September 1, 2011. Plaintiff filed a reply brief on September 19, 2011, and the case is now ready to decide.

II. The Lay Testimony at the Administrative Hearing

Plaintiff's testimony at the administrative hearing is found at pages 32 through 47 of the record. Plaintiff, who was 50 years old at the time of the hearing and attended school only through the eighth grade, testified as follows.

Plaintiff's employment history consisted of only two jobs,

both of which involved cleaning hotel rooms.  She testified that she stopped working due to hip problems, and then developed some mental health issues.

At the hearing, she stated that she was having pain in the L4-L5 area which was a steady, stabbing pain which averaged nine on a scale of one to ten.  It is helped by medication.  She saw her back doctor on a monthly basis but received no other treatment for that condition.

She also was seeing Dr. Hamill for her psychological condition.  She met with him once every two or three months, and with a counselor more often.  Being around people would make her nervous.

On a typical day, she got up, made coffee, sat until her back began to hurt, and then went back to lie down.  On a good day she could sit in a recliner and watch television.  She did little in the way of household chores other than washing some dishes.  Her back condition prevented her from driving.  She could sit about twenty minutes and stand about five minutes.  She could not walk more than twenty feet nor lift more than five pounds.  She also could not add or subtract well without a calculator.  She told the Administrative Law Judge that she was essentially bed-ridden and had been for a year.

After plaintiff testified in response to questions from her attorney and from the ALJ, the medical expert asked her some questions about alcohol use.  She generally denied any use except for a single incident in 2008, even though the medical records appeared to say otherwise.  (Tr. 47-50).

### III.  The Medical Records

The medical records in this case are found beginning on page 216 of the administrative record.  They can be summarized as follows.

Well prior to her alleged onset date, plaintiff received

mental health treatment from Dr. Shy.  In 2003, Dr. Shy completed
a form stating that plaintiff had fifteen marked impairments in
her ability to do work-related functions, and one extreme
limitation, that being in the area of completing a normal workday
and work week without interference from psychologically-based
symptoms.  No treatment notes accompanied that assessment.
Treatment notes from the Scioto Paint Valley Mental Health Center
for later years showed that plaintiff was being seen for anxiety
and depression but had trouble articulating what she meant by
being anxious, including being unable to identify when her
symptoms began or even what they were.  She did describe feeling
depressed every day and getting little sleep.  In 2006, she
denied any auditory hallucinations but did ask to change doctors
to get a more favorable evaluation for disability purposes. The
doctor who saw her at that time, Dr. Yezuita, thought her report
of daily depression was "more facetious than real" and he rated
her GAF at 55-60.

	Plaintiff saw Dr. Schneider for back and hip pain in early
2007.  She had some diffuse tenderness over the lumbosacral area
and some decreased range of motion secondary to pain.  She was
given a prescription for Vicodin.  A prior emergency room note
described her as "clearly opiate seeking" and the ER doctor
refused to write a prescription for such medication.

	Dr. Demuth, a state agency reviewer, completed a mental
residual functional capacity assessment form in March, 2007.  At
that time, he thought plaintiff's mental condition had not
changed from the date that a prior ALJ had considered this issue,
and he adopted that evaluation, which indicated plaintiff
suffered from either depression or a bipolar disorder, borderline
intellectual functioning, and generalized anxiety, and that her
impairments resulted in only mild restrictions of her activities
of daily living or social functioning, in moderate difficulty

maintaining concentration, persistence and pace, and in no episodes of decompensation.

Dr. Perencevich, also a state agency reviewer, evaluated plaintiff's physical capacity on July 9, 2007, and found that she had the residual functional capacity to perform light work but could only occasionally climb ladders, ropes or scaffolds. He thought that plaintiff was credible as to the impairments she reported, i.e. back pain due to degenerative arthritis, but not as to their severity.

Next, the record contains 41 pages of treatment notes from the Scioto Paint Valley Mental Health Center, dated from 2003 to 2007. Generally, they show that initially plaintiff's GAF was rated at 55-60 notwithstanding a diagnosis of generalized anxiety disorder, which had been exacerbated by psychosocial stress. In 2004, the notes show that she was insistent on being prescribed Xanax and was taking that medication from a neighbor, that she was resistant to suggestions that she see a counselor, that she showed some improvement after medication adjustments, that she was not always feeling depressed, that she refused to quit smoking, that she discontinued anti-anxiety medication at one point for fear of gaining weight, that she reported being chronically anxious and fearful, that she occasionally took more medication than prescribed, that she had a lot of social stressors in her life, that she tended to give up on tasks like psychological testing, and that her condition was generally unchanged from one visit to the next. A longer progress note was made on March 19, 2007, which was the first time she was seen by Dr. Hamill. At that time, she denied any depressive episodes or any history of panic attacks as well as any history of psychotic symptoms. She was visibly anxious but also irritable and demanding. Dr. Hamill refused to prescribe Xanax despite plaintiff's request for that medication, but did prescribe Valium

and Seroquel. A note from June, 2007 indicated that her condition had improved somewhat, and she reported to Dr. Hamill that she was "doing fine with the Valium," although she asked for a higher dose. He saw her again three months later and she described her racing thoughts and mood swings as "not too bad."

There are additional treatment notes concerning her back pain as well. At one time, she was diagnosed with spinal stenosis of the lumbar region as well as degenerative disc disease at L4-L5. Straight leg raising was positive on the right side. Tests showed some disc space narrowing.

Dr. Hamill completed a residual functional capacity form on October 11, 2007, which is one of the treating source opinions that plaintiff believes was not given appropriate weight. He generally described plaintiff as having shown some improvement on medications, but as suffering from "racing thoughts, poor concentration, and borderline intellectual functioning." Her prognosis was poor, and she was unable to meet competitive standards in the areas of maintaining regular attendance or being punctual, completing a workday or workweek without interruptions from psychologically-based symptoms, and dealing with work stress. He also thought she would have a marked impairment in the areas of concentration, persistence and pace, and that she had suffered four or more episodes of decompensation, each of at least two weeks' duration. In addition, she would miss more than four days of work each month due to her impairments. Approximately a year later, he completed a similar form but imposed even more restrictions.

Plaintiff's treating doctor for her hip and back pain, Dr. North, apparently requested a physical therapist to evaluate plaintiff's physical capabilities. That report showed that she could lift only five pounds, could stand, sit and walk for less than a full workday, had to lie down four or five times in a

workday, and had a large number of both postural and environmental limitations.  Dr. North later signed off on this evaluation.

Finally, there are some additional mental health treatment notes.  They show that by 2008, plaintiff was being prescribed Xanax, and that in 2009 she was doing well with her medication and did not want to make any changes.  That note described her as "pleasant and cooperative and looks like she is doing well." (Tr. 493).

IV. <u>The Medical Expert Testimony</u>

A medical expert, Dr. Madden, testified at the administrative hearing.  <u>See</u> Tr. 47-51.  Dr. Madden identified plaintiff's mental impairments as borderline intellectual functioning, alcohol abuse, depressive disorder not otherwise specified, and anxiety disorder not otherwise specified.  None of the mental impairments met the criteria of the Listing of Impairments.  Due to her borderline intellectual functioning, plaintiff would be limited to the performance of routine tasks not involving strict time production requirements.  Dr. Madden thought she should have only limited contact with the public.  He did not see the need for any other limitations.

V. <u>The Vocational Testimony</u>

Mr. Keiger, a vocational expert, also testified at the administrative hearing.  <u>See</u> Tr. 52-54.  He characterized plaintiff's past work as a housekeeper as light and unskilled. He was asked to assume that plaintiff had the mental limitations described by Dr. Madden and the physical restrictions described in Exhibit 8F, the evaluation done by Dr. Perencevich, which generally restricted plaintiff to work at the light exertional level with only occasional climbing of ropes, scaffolds and ladders.  In response, Mr. Keiger stated that plaintiff could still perform her past housekeeper job.  However, if she were

required to miss work more than four days per month, she was not employable.

### VI. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 11 through 22 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff met the insured requirements of the Social Security Act, and particularly the requirements for widow's disability benefits (plaintiff's husband had died after she submitted her original applications), through August 31, 2015. Next, he found that she had not engaged in substantial gainful activity from her amended onset date of October 11, 2007 through the date of the decision. As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including back pain with evidence of lumbar degenerative disc disease, hip pain with evidence of osteoarthritis, alcohol abuse, anxiety disorder, and depressive disorder. The ALJ also found that these impairments did not meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to perform light work but could only occasionally climb ladders, ropes or scaffolds and was limited to the performance of routine tasks with no strict time requirements and with limited contact with the public. The ALJ accepted the vocational expert's testimony that someone with such limitations could perform plaintiff's past work as housekeeper. As a result, the ALJ concluded that plaintiff had not demonstrated an entitlement to benefits.

### VII. Plaintiff's Statement of Specific Errors

In her statement of specific errors, plaintiff raises three issues. She argues that the ALJ erred by not affording controlling weight to the opinions of Drs. Hamill and North; that the ALJ did not properly evaluate whether her mental impairment satisfied sections 12.04(B) and (C) of the Listing of Impairments; and that the ALJ improperly determined that her testimony was not credible. The Court reviews the administrative decision under this legal standard:

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

Because the way in which the ALJ dealt with Dr. Hamill's opinions affects both the issue of whether he gave appropriate weight to those opinions generally, and whether those opinions should have been followed to the extent that they describe an impairment of sufficient severity to satisfy the Listing of Impairments, the Court will deal with those two questions together. It will separately analyze the way in which the ALJ weighed Dr. North's opinion and plaintiff's credibility.

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. Bull v. Comm'r of Social Security, 629 F.Supp. 2d 768, 780-81 (S.D. Ohio 2008), citing Cornett v. Califano, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979).

A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. The weight given such a statement depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. §404.1527; Harris v. Heckler, 756 F.2d 431 (6th Cir. 1985). In evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's

activities of daily living.  Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).

If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference.  Harris, 756 F.2d at 435.  The Commissioner may have expertise in some matters, but cannot supplant the medical expert.  Hall v. Celebrezze, 314 F.2d 686, 690 (6th Cir. 1963). The "treating physician" rule does not apply to a one-time examining medical provider, and the same weight need not be given to such an opinion even if it favors the claimant.  Barker v. Shalala, 40 F.3d 789 (6th Cir. 1994).  Additionally, the Commissioner is required to provide a meaningful explanation for failing to accord controlling weight to the opinion of a treating source, with reference to the various factors set forth in 20 C.F.R. §404.1527(d).  Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

Here, the ALJ apparently concluded that plaintiff's mental impairment did not satisfy the Listing because, contrary to Dr. Hamill's views, she did not have marked impairments in the area of concentration, persistence and pace, and had not had multiple episodes of decompensation.  He reached the former conclusion by giving more weight to the views of the state agency reviewers, and the latter by noting that there was absolutely no evidence of any episodes of decompensation, nor any mental health-related hospitalizations.  When arriving at the residual functional capacity assessment, the ALJ first discounted Dr. Shy's opinion as to extreme limitations because it was rendered years before plaintiff's alleged onset date, plaintiff had shown improvement since that time, and the opinion was inconsistent with later evidence and Dr. Shy's own notes.  Second, in a section of the administrative decision that is more than one-and-one-half pages long, the ALJ determined that Dr. Hamill's opinions were

-10-

"inconsistent with the record as a whole as well as his own treatment notes and those of the other mental health professionals at the Scioto Paint Valley Mental Health Center." (Tr. 18). He also noted that the increased limitations in the 2008 report were not supported by any increase in symptoms or were not explained. The ALJ then described a number of activities reflected in the record which plaintiff had engaged in, such as helping her son apply for benefits and helping a friend with legal problems, and concluded that these also cast doubt on the extreme limitations imposed by Dr. Hamill. Finally, the ALJ observed that despite the seeming extreme severity of plaintiff's symptoms, Dr. Hamill continued to see her only once every four months and did not make any medication changes from 2007 to 2008. For these reasons, the ALJ gave Dr. Hamill's opinions less weight, gave the state agency reviewers' opinions some weight, and gave the most weight to Dr. Madden's testimony.

Plaintiff argues in her statement of errors and in her reply that Dr. Hamill's opinion was entitled to controlling weight because of his status as a treating source, the length of the treating relationship, and the absence of other evidence to contradict his findings. She specifically asserts that his treatment notes do not, as the ALJ suggested, fail to support his evaluation of the severity of plaintiff's symptoms, and that matters referred to by the ALJ as examples of plaintiff's ability to function above the level described by Dr. Hamill "hardly substantiate a competitive work profile." Plaintiff's Statement of Errors, Doc. #14, at 20. She also questions how thoroughly Dr. Madden reviewed the record given his questioning of her at the administrative hearing about alcohol use or abuse.

In the Court's view, the ALJ both had, and articulated, valid reasons for affording less than controlling weight to the opinions of Dr. Hamill. It is certainly true that there is

-11-

nothing in this record, even in Dr. Hamill's treatment notes, to support the occurrence of four or more episodes of decompensation, but Dr. Hamill reported that these existed. Further, an ALJ may reject the opinion of a treating source "where the treating physician's opinion is inconsistent with [that source's] own medical records." Jackson v. Astrue, 2011 WL 854877, *5 (M.D. Ala. March 10, 2011); see also Smith v. Astrue 2009 WL 2733827 (S.D. Ohio August 26, 2009) (sustaining ALJ's decision to afford less weight to treating mental health source due to inconsistencies between treatment notes and an opinion of disabling symptoms). The various notes do not indicate symptoms of such severity, and, as recited above, plaintiff had expressed a desire to change doctors simply in order to enhance her ability to obtain disability benefits. The notes paint a picture of a patient who demanded certain medications, used her neighbor's medications when she did not obtain the ones she wanted from her own mental health treatment provider, and who vaguely and inconsistently reported symptoms, but who managed to obtain an opinion of total disability from Dr. Hamill only a few months after she began to see him. These and the other criticisms which the ALJ made of Dr. Hamill's opinion are appropriate and could have led a reasonable person to find that Dr. Madden's view was more objective and more grounded in the medical record as a whole, notwithstanding plaintiff's attack on his credibility based on his concern about there being an untreated alcohol problem - something that did find support in some of the medical records. For these reasons, the Court finds that the ALJ was entitled to discount Dr. Hamill's views both on whether plaintiff's impairment met the Listing and whether it was completely disabling.

Similarly, the ALJ did not err in the way that plaintiff's physical capacity was determined. Neither Dr. North nor the

physical therapist, Mr. Banks, provided any support for the residual functional capacity finding which they either developed or approved. The medical records do not, as the ALJ pointed out, appear to support such drastic limitations. There is other evidence supporting a finding that plaintiff can do light work, and a reasonable person could have relied on it.

Finally, plaintiff argues that her credibility was not properly assessed. This issue is uniquely within the province of the ALJ to determine, and unless the reasons given for disbelieving a claimant's testimony are wholly invalid or unsupported in the record, the Court has little discretion to make a contrary finding. See, e.g., 20 C.F.R. §404.1529(c)(3); Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

Here, the ALJ based his credibility findings on these factors: that her claim that she needed to lie down for most of the day was inconsistent with the course of treatment she pursued for her physical impairments; that her telephone reports to the Social Security Administration contained inconsistencies; that her activities are inconsistent with someone who is essentially bedridden; and that her reported symptoms are not supported by the medical records. Plaintiff attempts to characterize these inconsistencies as minimal, but the ALJ's decision shows that he fully considered the record and had support for the credibility determination which was made. When this occurs, the Court must defer to that determination, and it should do so here.

## VIII. Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social Security.

## IX. Procedure on Objections

If any party objects to this Report and Recommendation,

that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge